IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL NO. <u>2:21-cr-00142</u>

DAVID KEITH NUTTER

RESPONSE OF THE UNITED STATES
TO DEFENDANT'S MOTION TO DISMISS

The defendant, David Keith Nutter, has filed a motion to dismiss the indictment. ECF 62. The defendant does not dispute any of the facts alleged in the indictment. He argues the indictment charging him with possession of a firearm by a person previously convicted of a misdemeanor crime of domestic violence under § 922(g)(9) is unconstitutional after the Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, ---U.S.---, 142 S. Ct. 2111 (2022).

The defendant's *Bruen*-based motion should be denied. Assuming the merits of the defendant's arguments can be reached, *Bruen* does not change the outcome this Court's prior decision upholding the constitutionality of the indictment in this case.

I. **Background**[1]

The defendant previously raised a Second Amendment challenge to the indictment in a motion to dismiss filed on May 2, 2022. ECF 45. He argued that § 922(g)(9) was unconstitutional as applied to him under the contours of the individual right to possess firearms for self-defense

---

[1] The United States incorporates by reference the background section concerning § 922(g)(9) and the indictment in this case contained in its prior response to the defendant's previous motion to dismiss. ECF No. 50 at 2-3.

outlined in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and due to the age of his domestic violence convictions (19 years) prior to indictment in this case. *See id*.

On May 17, 2022, this Court denied the defendant's prior motion to dismiss. ECF No. 54. In doing so, it rejected the defendant's Second Amendment arguments, including the as-applied challenge based on the age of the convictions. *United States v. Nutter*, No. 2:21-CR-00142, 2022 WL 1558748, at *4 (S.D.W. Va. May 17, 2022) (citing *Harley v. Wilkinson*, 988 F.3d 766, 767 (4th Cir. 2021), *cert. denied sub nom. Harley v. Garland*, 142 S. Ct. 426 (2021)).

The Supreme Court issued the *Bruen* decision on June 22, 2022. 142 S. Ct. 2111. *Bruen* clarified that the "two-step' framework" involving "means-end scrutiny" in use by various appellate courts, including the Fourth Circuit, does not apply to regulations implicating the right to self-defense found in *Heller* under the Second Amendment. *Id*. 2111. Instead, *Bruen* clarified that the appropriate methodology centers "on constitutional text and history." *Id*. When a regulation is directed at conduct that the Second Amendment protects, the "government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2129–30.

On August 1, 2022, the defendant filed the instant motion to dismiss. ECF 62.

**II. Argument**

    **A. The Constitutional right to bear arms for self-defense only covers law-abiding citizens; Domestic abusers are not law-abiding citizens.**

The Supreme Court has made abundantly clear that the Second Amendment protections only apply to law-abiding citizens.[2] *See id*. at 2131 ("[T]he Second Amendment . . . 'surely elevates above all other interests the right of law-abiding responsible citizens to use arms.'"); *id*. at

---

[2] In fact, the majority opinion in *Bruen* makes more than ten references to "law-abiding" citizens. *See* 142 S. Ct. 2111.

2

2138 ("Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense."); *id*. at 2159 (Alito, J., concurring) ("I reiterate: All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law, which makes that virtually impossible for most New Yorkers, is unconstitutional.") (emphasis added); *see also id*. at 2156 ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense from exercising their right to keep and bear arms.").

This rationale supports the assertion that restricting the possession of a firearm by a person convicted of a misdemeanor crime of domestic violence is not unconstitutional. It was undisputed in *Bruen* that the petitioners were "two ordinary, law-abiding, adult citizens," which specifically made them a "part of 'the people' whom the Second Amendment protects." 142 S. Ct. at 2134. That the individuals were "law-abiding," but still required to demonstrate a special need appears to have been the Supreme Court's primary issue with the New York law. *See generally, id*. Here, however, no such issue exists because a person convicted for a misdemeanor crime of domestic violence is, by definition, not law-abiding. *See also United States v. Daniels*, --- F. Supp. 3d ---, 2022 WL 2654232, at *2 (D. Miss. July 8, 2022) ("Because it is concerned with 'unlawful' drug users and addicts, there is some doubt that section 922(g)(3) is textually covered by the Second Amendment, insofar as it has been interpreted to guarantee the right to keep and bear arms to ordinary, law-abiding, responsible citizens concerned with self-defense.").

In fact, a person convicted of a misdemeanor crime of violence is exactly the kind of non-law-abiding, dangerous person that the Second Amendment does not protect. In other words, for

§ 922(g)(9)'s prohibition to apply, the person was specifically found, after Due Process, to not be a law-abiding citizen.

Moreover, the Supreme Court reiterated that "the right secured by the Second Amendment is not unlimited." *Bruen*, 142 S.Ct. at 2128 (quoting Heller, 554 U.S. at 626). Supporting this, the Justices who made up the majority understood the opinion to "decide[] nothing about who may lawfully possess a firearm." *Id*. at 2157 (Alito, J., concurring); *see also id*. at 2162 (Kavanaugh, J., concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations.") (citing *Heller*, 554 U.S. at 636); *id*. ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . [which are] only examples [and] . . . does not purport to be exhaustive." (quoting *Heller*, 554 U.S. at 626–27 & n.26; *citing McDonald v. Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion)).

### B. Longstanding history of disarming violent criminals demonstrates that § 922(g)(9) withstands the historical analysis outlined in *Bruen*.

Even if the Second Amendment were to apply to those convicted of a misdemeanor crime of violence, the class of persons with which § 922(g)(9) is concerned—domestic abusers—have historically been restricted from firearm ownership and possession. The precursor to the Second Amendment proposed at the Pennsylvania ratifying convention stated: "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). That proposal reflects a contemporary belief during the founding era that the government could disarm a person for any crime, not just a felony. Moreover, there is a robust historical tradition of disarming people convicted of a "crime of violence." *See* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harvard Journal of Law & Public Policy 695, 701 (2009). This tradition

4

suggests that, at a minimum, a misdemeanor crime of domestic violence is a permissible basis for disarmament.

Accordingly, following *Heller*, many courts of appeals, including the Fourth Circuit, accepted the argument that domestic-violence misdemeanants are sufficiently akin to felons that they too can be disarmed. *See Skoien*, 614 F.3d at 643-44; *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013); *United States v. Staten*, 666 F.3d 154, 158 (4th Cir. 2011); *United States v. Booker*, 644 F.3d 12, 23-25 (1st Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680-81 (4th Cir. 2010). *See also United States v. Walker*, 709 F. Supp. 2d 460, 465-66 (E.D. Va. 2010); *Kanter v. Barr*, 919 F.3d 437, 454, 456-58 (7th Cir. 2019) (Barrett, J., dissenting) ("The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety. This is a category simultaneously broader and narrower than 'felons'—it includes dangerous people who have not been convicted of felonies but not felons lacking indicia of dangerousness.").

### C. Historical regulations regarding domestic violence further support the constitutionality of § 922(g)(9).

Defendant argues that § 922(g)(9) must fail under *Bruen* due to the recency of the passage of the statute. However, this argument misunderstands the *Bruen* analysis.

To be sure, *Bruen* said that, where a modern regulation addresses "a general societal problem that has persisted since the 18th century," "the lack of a distinctly similar historical regulation"—or a historical regulation that address the problem "through materially different means"—could be "relevant evidence" that the statute is unconstitutional. *Bruen*, 142 S. Ct. at 2131. But *Bruen* did not suggest that a statute is unconstitutional simply because it involves a new way to address longstanding concerns. As *Bruen* recognized, some modern statutes implicate

5

"unprecedented societal concerns," and some modern regulations "were unimaginable at the time of the founding." *Id.* at 2132. Yet those statutes are constitutional if supported by an appropriate "historical analogue." *Id.* at 2133. *Bruen* gave the example of historical laws prohibiting the carrying of firearms in "sensitive places" and said that "courts can use analogies to those historical regulations . . . to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.* at 2133. Thus, *Bruen* does not suggest that a statute is unconstitutional just because it targets a longstanding societal problem in a new way.

While domestic violence has long been recognized as a problem, defendant fails to acknowledge the ways that problem may have changed in the last two centuries. Although crime statistics from the founding era are hard to come by, there is reason to doubt that domestic *homicide* was as prevalent at the founding as it is in the modern era. Between 1980 and 2008, more than 16% of homicides in the United States—and more than 41% of homicides where the victim was female—were committed by the victim's spouse or intimate partner, with more than half of those homicides involving a firearm. Bureau of Justice Statistics, Homicide Trends in the United States, 1980-2008, 10, 16-17 (Tables 6, 8) (November 2011), available at, https://bjs.ojp.gov/content/pub/pdf/htus8008.pdf. Thus, the problem that § 922(g)(9) seeks to address – the danger posed by those who have already been convicted of at least one act of domestic violence - may not have existed to the same degree in 1791, meaning that little can be drawn from legislatures' failure to enact precisely analogous laws at the time.

Defendant's argument fails because § 922(g)(9) is not as novel as he assumes. The statute targets a specific group—those who have been convicted of a crime of domestic violence—who fall within the broader class of dangerous persons who have *always* been within the government's

power to regulate.  *See Bruen*, 142 S. Ct. at 2150 ("Under the common law, individuals could not carry deadly weapons in a manner likely to terrorize others.").  Section 922(g)(9) is not like the regulations in *Heller* and *Bruen*, which sought to combat the "perceived societal problem" of "firearm violence in densely populated communities" by prohibiting most or all law-abiding citizens from keeping or carrying firearms.  *Bruen*, 142 S. Ct. at 2131.

The fact that this specific statutory means of preventing domestic violence is a relatively recent invention does not mean that § 922(g)(9) is unconstitutional.  In fact, the history shows that other protections—most notably the common-law surety process—were long available to protect victims of domestic violence.

Blackstone observed that a husband "was prohibited to use any violence to his wife."  1 Blackstone 432.  Thus, Blackstone said, "a wife may now have security of the peace against her husband; or, in return, a husband against his wife." *Id.* at 433.  In one case that Blackstone cited, the wife "made oath in Court, that she was in danger of her life by [her husband]," and the court "offered to bind him with sureties," despite multiple affidavits attesting to the husband's "good usage" of his wife.  *King v. Lord Lee*, 83 Eng. Rep. 482 (K.B. ca. 1675).  In another, the husband swore out the peace against his wife.  *Sims's Case*, 93 Eng. Rep. 1131 (1743-44). The English common-law system has thus allowed spouses to seek protection from abuse for centuries.  *See also Lord Leigh's Case*, 84 Eng. Rep. 807 (1674) (the wife "upon affidavit of hard usage, and that she went in fear of her life, prayed security of the peace against [her husband], which was granted"); *Manby v. Scott*, 82 Eng. Rep. 1000, 1005 (Ex. 1659) (observing that a husband "cannot kill" his wife, "nor can he beat her, for the wife can seek the peace"), *as translated by* Henry Ansgar Kelly, "Rule of the Thumb and the Folklaw of the Husband's Stick," 44 J. Legal Ed. 341, 354 (1994); *Sir Thomas Seymor's Case*, 72 Eng. Rep. 966 (K.B. ca. 1615) ("[A] wife can have the

peace against her husband for unreasonable correction."), *as translated by* Kelly, 44 J. Legal Ed. at 355.

In America, "the Massachusetts Bay and Plymouth colonies had laws against spouse beating." Carolyn B. Ramsey, "The Stereotyped Offender: Domestic Violence and the Failure of Intervention," 120 Penn. State L. Rev. 337, 344 (2015). For example, the Massachusetts Body of Liberties provided that "[e]verie marryed woeman shall be free from bodilie correction or stripes by her husband, unless it be in his owne defence upon her assalt." Massachusetts Body of Liberties § 80 (1641). Although other colonies did not protect spouses by statute, America's first family law treatise observed that a husband or wife's "violation of each other's rights, by an unjustifiable violence, is a breach of the laws of society, for which they are liable *criminaliter*." Tapping Reeve, The Law of Baron and Femme; of Parent and Child; of Guardian and Ward; of Master and Servant; and of the Powers of Courts of Chancery 65 (New Haven, Oliver Steele 1816). And, the treatise explained, a husband or wife "may institute a process against each other, the object of which is to compel them to find securities for their good behavior." *Id.* at 65-66; *see also State v. Davis*, 3 Brev. 5 S.C.L. 3, 4 (S.C. Const. Ct. App. 1811) ("It is clear that a wife may demand sureties of the peace against her husband, and so may her husband against her."). Thus, while § 922(g)(9) may be a recent means of protecting victims of domestic violence, there are historical analogues that allowed spouses to be protected from domestic violence.

Section 922(g)(9)'s prohibition on those who have been convicted criminally for domestic violence sits at the intersection of the longstanding history of the prevention of domestic violence and the equally longstanding history of disarming those who pose a danger to others. Those who have been convicted of a crime of domestic violence pose a specific type of danger that has been

8

regulated for centuries, as described above. The disarming of those convicted of misdemeanor crimes of domestic violence is constitutional under *Bruen* analysis.

### III.     Conclusion

The United States requests that the defendant's motion to dismiss (ECF No. 62) be denied.

                                                   Respectfully submitted,

                                                   WILLIAM S. THOMPSON
                                                   United States Attorney

By:    /s/ Andrew J. Tessman
        ANDREW J. TESSMAN
        Assistant United States Attorney
        West Virginia Bar No. 13734
        300 Virginia Street, East
        Room 4000
        Charleston, WV 25301
        Telephone:  304-345-2200
        Email:  andrew.tessman@usdoj.gov

## CERTIFICATE OF SERVICE

It is hereby certified that the foregoing document has been electronically filed and service has been made on opposing counsel by virtue of electronic filing on August 9, 2022, to:

Lex Coleman
United States Courthouse, Room 3400
300 Virginia Street East
Charleston, West Virginia 25307

By:     /s/ Andrew J. Tessman