IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.            CRIMINAL ACTION NO. 2:21-cr-00142

DAVID KEITH NUTTER,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Defendant's Bruen-Based Motion to Dismiss* (Document 62), the *Response of the United States to Defendant's Motion to Dismiss* (Document 66) and the *Defendant's Reply on Bruen-Based Motion to Dismiss* (Document 67). For the reasons stated herein, the Court finds that the renewed motion to dismiss should be denied.

The Court has also reviewed the *Motion of the United States for Leave to File Supplemental Authority* (Document 68) and the *Defendant's Further Reply to United States' Supplemental Response* (Document 69). The Court finds that the United States' motion, which simply attaches a district court case addressing the same issue presented herein, should be granted. However, the Defendant's "further reply," an 11-page supplemental brief addressing both the newly decided case submitted by the United States and previously available law and history expounding on his previous arguments, does not comply with the briefing deadlines established by the Court or any rule of procedure. A notice of supplemental authority does not automatically

1

open the door to additional briefing, and the Court directs that the Defendant's additional reply brief be stricken.

## FACTS AND PROCEDURAL HISTORY

The Defendant, David Keith Nutter, was charged with possession of firearms by a person previously convicted of misdemeanor crimes of domestic violence, in violation of 18 U.S.C. §§ 922(g)(9) and 924(a)(2), in an *Indictment* (Document 6) returned on August 11, 2021. The Indictment charges that, on or about July 6, 2019, Mr. Nutter possessed a Rexio, S.R.L., .22 caliber revolver, a Harrington and Richardson, 20-gauge shotgun, a Marlin, Model 25MN, .22 caliber rifle and an Ithaca, 20-gauge shotgun. The Indictment further alleges that he had been previously convicted of the following misdemeanor crimes of domestic violence:

a. Convicted on or about July 14, 1998, in the Canton Municipal Court, of Domestic Violence on a Family or Household Member, in violation of Ohio Rev. § 2919.25;

b. Convicted on or about August 19, 2002, in the Court of Common Pleas of Stark County, Ohio, of Domestic Violence on a Family or Household Member, Felony in the Fifth Degree,[1] in violation of Ohio Rev. § 2919.25(A); and

c. Convicted on or about August 19, 2002, in the Court of Common Pleas of Stark County, Ohio, of Endangering Children (Child Abuse) in violation of Ohio Rev. § 2919.22(B)(1).

---

1 A fifth-degree felony in Ohio is punishable by up to 12 months imprisonment and is thus treated as a misdemeanor for purposes of 18 U.S.C. §922. Although the Judgment Entry states that the offense is a fifth-degree felony, the Court notes that the version of Ohio Rev. Code § 2919.25 in effect at the time of Mr. Nutter's conviction appears to provide that violation of subsection A constitutes a first-degree misdemeanor, or, if the offender had previously been convicted of domestic violence, a fourth-degree felony. Ohio Rev. Code § 2919.25(D)(2)–(3) (Effective to April 6, 2009); R.C. PRE-7/1/96 § 2919.25(D).

2

Law enforcement began investigating the Defendant after interviewing two juvenile females who had run away.[2] On July 6, 2019, one of the minors wrote a statement describing what had happened during the time they were missing that indicated a friend took them to the Defendant's home on the Fourth of July. Both minors stated that they were drinking alcohol supplied by the Defendant while there. Both separately described the Defendant recklessly waving around loaded firearms. Their friend stated that he and the Defendant fired the guns behind the house. One of the minors and the friend indicated that the Defendant's daughter later hid the guns because the Defendant was intoxicated. One of the minors told police that the Defendants said he was a felon. Law enforcement executed a search warrant on July 6, 2019, and seized two rifles, two shotguns, three muzzleloader pistols, and assorted ammunition.

Investigation into his criminal history ultimately led to the instant indictment. The domestic violence offenses listed in the indictment involved striking and pushing his minor stepdaughter, causing physical harm, causing physical harm to an adult female family or household member (the mother of his child), and causing physical harm to a minor female.

The Defendant filed a previous motion to dismiss on multiple grounds, which the Court denied in a *Memorandum Opinion and Order* (Document 54) entered on May 17, 2022. The Defendant then entered a conditional plea of guilty, preserving his right to appeal the denial of the motion to dismiss, on June 9, 2022. On June 23, 2022, the Supreme Court issued an opinion related to Second Amendment challenges to gun regulations. *New York State Rifle & Pistol Ass'n,*

---

2 The information regarding the circumstances surrounding the Defendant's arrest is drawn from the Presentence Investigation Report, and is contested by the Defendant. This discussion is intended only to briefly describe the background of the investigation that led to discovery of the Defendant's possession of firearms, not to resolve any factual disputes.

*Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The Defendant's current motion to dismiss asks the Court to consider his constitutional challenge to the charge based on that decision.[3]

## DISCUSSION

Mr. Nutter argues that the lifetime prohibition on possession of a firearm by a person convicted of a misdemeanor crime of domestic violence violates the Second Amendment as interpreted in *Bruen*. He argues that "a misdemeanor domestic violence conviction was not a disability which existed when the Second Amendment was ratified in 1791." (Def.'s Mot. at 2.) He contends that his conduct, possessing firearms in his home, falls within the protections of the Second Amendment, and that there was no historical tradition in existence around the time of enactment of the Second Amendment related to disarming domestic violence misdemeanants. Therefore, he argues that the Indictment should be dismissed.

The United States counters that precedent on the Second Amendment, including the Supreme Court's opinion in *Bruen*, emphasizes that these protections apply to *law-abiding* gun owners. It contends that the Second Amendment is not applicable to dangerous, non-law-abiding people, including those with convictions for domestic violence. The United States cites a historical tradition of barring people from possessing firearms based on criminal convictions and/or findings of dangerousness, as well as providing protections against spousal abuse. The United States reasons that "Section 922(g)(9)'s prohibition on those who have been convicted criminally for domestic violence sits at the intersection of the longstanding history of the

---

3 The Defendant also filed a motion to withdraw his plea of guilty. If the Court found dismissal appropriate under current precedent, the Court would permit withdrawal of the guilty plea given the status of the case at the time the Supreme Court issued *Bruen*. Because the Court finds that the motion to dismiss must be denied, and the Defendant does not contest any of the facts alleged in the Indictment, there is no basis for withdrawal of the guilty plea, although it may be appropriate for the parties to amend the plea agreement to confirm the appealability of this order.

prevention of domestic violence and the equally longstanding history of disarming those who pose a danger to others." (United States' Resp. at 8.) Thus, it argues that *Bruen* does not alter the Court's previous conclusion that the Second Amendment permits restrictions on gun ownership for people convicted of a misdemeanor crime of domestic violence.

In reply, the Defendant argues that it is "undisputed that—at the time of the Founding—domestic violence misdemeanants simply were not disarmed in the United States." (Def.'s Rep. at 3.) He reasons that because domestic violence was a social problem at the time of the Founding, but did not then result in legal disarmament, there is no historical tradition that would support upholding 18 U.S.C. §922(g)(9). The Defendant delves into the history of women's rights, noting that "[w]hen the Fourteenth Amendment was ratified in 1868, 'citizens' and 'voters' were still defined exclusively as male," and women's right to vote was recognized only with ratification of the Nineteenth Amendment in 1920.[4] (*Id.* at 4.) In addition, he contends that the "people" protected by the Second Amendment does not exclude groups based on criminal history, any more than that term could be read to exclude such groups from the protections of the First or Fourth Amendments.[5]

---

4 If it is Defense Counsel's intent, in this foray into the history of women's rights, to suggest that the Founders would have rejected a regulation designed to disarm domestic batterers in order to prevent them from escalating violence against their family members with firearms on the basis that the predominately female victims were not worthy of such protection because the Founders failed to recognize women as full citizens, the Court declines the opportunity to follow him down that path.

5 The Court presumes without deciding that the Defendant is correct that the conduct at issue—possession of guns in common use—is protected by the Second Amendment, leaving the Court to address whether the regulation prohibiting people convicted of misdemeanor crimes of domestic violence from such possession is consistent with the understanding of the Second Amendment at the time of its enactment. As discussed *infra*, some scholars and judges have suggested that the Second Amendment applied only to "virtuous" or law-abiding citizens. However, in the Court's view, the history surrounding that issue lends itself more smoothly to the analysis of whether a given regulation is consistent with historical tradition.

In the first motion to dismiss, the Court applied the two-part test developed by circuit courts, including the Fourth Circuit, after the Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008). Under that test, courts conducted a historical inquiry into whether a law regulated conduct within the scope of the Second Amendment, then conducted an intermediate scrutiny analysis to evaluate the fit between the law and the governmental objective. *United States v. Chester*, 628 F.3d 673, 680–83 (4th Cir. 2010). After the Court issued the opinion resolving the first motion to dismiss, but before the entry of judgment, the Supreme Court decided *Bruen*. The Supreme Court rejected the two-part test in favor of greater focus on a historical analysis of acceptable forms of gun regulation. *Bruen*, 142 S. Ct. 2111 at 2125. The Court held that "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.[6] Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2126.

As an initial matter, the Court's previous opinion denying the motion to dismiss relied upon binding Fourth Circuit precedent finding that 18 U.S.C. §922(g)(9) survived a Second Amendment challenge. Because that precedent relied in part upon the means-ends scrutiny rejected in *Bruen*, the Court finds that *Bruen* "constitutes an intervening decision that relieves this Court of its

---

6 As the Defendant emphasizes, the Supreme Court placed the burden on the Government to demonstrate that a given regulation is consistent with historical tradition. It is not entirely clear what that burden means for district courts considering the constitutionality of a regulation in the first instance. Although, in time, caselaw will develop with judicial findings on the historical underpinnings of various firearm regulations, at this point the standard requires original historical research into somewhat obscure statutory and common law authority from the eighteenth century by attorneys with no background or expertise in such research. Presumably, courts remain free to explore historical sources outside those presented by the parties, just as courts routinely apply legal authority omitted from the parties' briefing.

obligation to follow" otherwise binding Circuit precedent. *United States, v. Barry B. Jackson, Jr.,* No. CR-22-59-D, 2022 WL 3582504, at *2 (W.D. Okla. Aug. 19, 2022).

*Bruen* outlined some considerations for courts addressing regulations related to societal problems that existed in the 18th century:

> The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Bruen*, 142 S. Ct. at 2131. The Supreme Court emphasized, though, that "[a]lthough its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 2132. The Court's discussion of limitations on firearms in sensitive places is instructive. The Court explained that "[a]lthough the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited…we are also aware of no disputes regarding the lawfulness of such prohibitions." *Id.* at 2133. "And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id*.

The regulation at issue in *Bruen* limited permits to carry firearms outside the home to those who could show good cause. Thus, the opinion focuses on regulations impacting law-abiding

citizens, as opposed to the class of regulations prohibiting certain people from carrying firearms based on their conduct or characteristics. Such restrictions have a longstanding history, as the Supreme Court recognized in *Heller*: "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," among other restrictions. *D.C. v. Heller*, 554 U.S. 570, 626 (2008) (describing such restrictions as "presumptively lawful").[7]

As the Fourth Circuit and many commentators have recognized, though, there is not clear historical evidence that those "longstanding" prohibitions, dating to the early 20th century, existed in similar form in the founding era. *United States v. Chester*, 628 F.3d 673, 680–81 (4th Cir. 2010) (noting that "[c]ommentators are nonetheless divided on the question of categorical exclusion of felons from Second Amendment protection."); Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit,* 60 Hastings L.J. 1371, 1376 (2009); Adam Winkler, Heller's *Catch-22*, 56 UCLA L. Rev. 1551, 1562–63 (2009).

The surety laws cited by the United States establish that domestic violence was a concern in the founding era, and that laws designed to restrict the rights of those who committed such abuse, and protect the victims, were not viewed as controversial. The Defendant suggests that the lack of laws expressly prohibiting people convicted of misdemeanor crimes of domestic violence from possessing firearms suffices to require dismissal. After all, domestic violence has been a social problem throughout history, and there is limited evidence of formal legal process to disarm domestic abusers prior to the 20th century. But although domestic violence existed,

---

[7] Justice Kavanaugh, joined by Chief Justice Roberts, authored a brief concurrence to *Bruen*, reiterating this language in *Heller*. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., concurring).

"misdemeanor crimes of domestic violence," as defined in 18 U.S.C §922(g)(9) and § 921(a)(33), did not, limiting the practical availability of similar regulations. Laws surrounding domestic violence have evolved, in part as women's rights and roles in society expanded. The absence of stronger laws may reflect the fact that the group most impacted by domestic violence lacked access to political institutions, rather than a considered judgment about the importance or seriousness of the issue.

The criminal code, as a whole, has evolved dramatically since the late eighteenth century. *See* William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L. Rev. 505, 507–09 (2001) (describing the breadth of current criminal law and noting that the expansion of criminal law "is a constant, going back (at least) to the mid-1800s."). To suggest that only people convicted of crimes with an exact historical analogue can be subject to gun restrictions would lead to absurd results. The core question presented is whether the prohibition at issue would have been viewed as consistent with the Second Amendment in the founding era. Because the legal landscape surrounding crime and punishment was vastly different,[8] the absence of an equivalent prohibition on firearm possession by people convicted of domestic violence offenses is not dispositive.

The text of the Second Amendment itself is instructive: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be

---

8 Some commentators have noted that many more felonies were punishable by death, limiting any need for future restrictions for felons. Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) (arguing that felons fall outside the protections of the Second Amendment entirely); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U.L. Rev. 1187, 1217 (2015) ("it is doubtful that a framing-era felony conviction is properly analogized to a contemporary felony conviction" because "a felony conviction has far different significance today than in the framing era.").

infringed." U.S. Const. amend. II. The Supreme Court in *Heller* found that the prefatory clause served to "announce[] a purpose" for the operative clause, which guarantees an individual right to keep and bear arms. *D.C. v. Heller*, 554 U.S. 570, 577 (2008). The "militia" referenced in the prefatory clause is defined to include "all able-bodied men." *Id.* at 596. And "the adjective 'well-regulated' implies nothing more than the imposition of proper discipline and training." *Id.* at 597.

A post-*Heller* analysis discussing the historical justification for the "presumptively lawful" regulations listed in the opinion argues that the "proper discipline" necessary to ensure a "well-regulated" militia may properly be understood to encompass regulations consistent with the purposes of the Second Amendment, with those purposes including possession of firearms for both individual and national defense. Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U.L. Rev. 1187, 1231–33 (2015) ("because the framing-era understanding was that the right would be exercised by those subject to regulatory authority, it would do serious violence to this original understanding to disaggregate the right from the existence of regulatory authority."). Professor Rosenthal reasons that the preamble and the operative clause

> must be harmonized, not placed in conflict with each other. Understanding the preamble as supplying a textual acknowledgement that not all regulation amounts to an "infringement" on the right to keep and bear arms, in turn, solves a good number of textual problems lurking in *Heller*'s treatment of firearms regulation. The Second Amendment, read in light of its preamble, reflects a textual commitment to regulation found nowhere else in the Bill of Rights….[S]ince the preamble preserves regulatory authority in a generic manner, rather than endeavoring to preserve framing-era practice as in the Seventh Amendment, it becomes possible to explain why the right to keep and bear arms tolerates regulations unknown in the framing era.

> To be sure, the preamble does not contemplate limitless regulation. For one thing, a boundless regulatory power could convert the right into a nullity, which is not a plausible reconciliation of the operative clause and the preamble.

*Id.* at 1232–33.

Consistent with this understanding of the preamble to the Second Amendment contemplating regulations designed to ensure public safety, the historical record reflects significant regulation of firearms designed to ensure responsible and safe gun ownership. Guns could be required to be registered, people could be required to attend trainings for militia service, and fire codes regulated storage of firearms and gun powder. Adam Winkler, Heller's *Catch-22*, 56 UCLA L. Rev. 1551, 1562–63 (2009). In addition, there were "complete bans on gun ownership by free blacks, slaves, Native Americans, and those of mixed race" as well as people who "refused to swear loyalty oaths." *Id*. *Bruen* references founding-era laws prohibiting "bearing arms in a way that spreads 'fear' or 'terror' among the people." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2145 (2022).

While serving on the Seventh Circuit Court of Appeals, now-Justice Amy Coney Barrett authored a dissent offering a detailed analysis of firearm regulations related to felons that is similarly instructive. She recounted English laws prohibiting possession of firearms by Catholics, based on their presumed untrustworthiness or disloyalty to the Crown, as well as early American laws both before and after the Revolution disarming slaves and Native Americans. *Kanter v. Barr*, 919 F.3d 437, 457–58 (7th Cir. 2019), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) (Barret, J., dissenting). "In sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Id.* at 458. Thus, although then-Judge Barrett disagreed with the panel majority conclusion that even

11

nonviolent felons may categorically "lose their Second Amendment rights solely because of their status as felons," she reasoned that history "does support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous." *Id.* at 464.

The prohibition on possession of firearms by those convicted of misdemeanor crimes of domestic violence fits easily within this framework of regulation consistent with the history and purposes of the Second Amendment and designed to keep firearms away from dangerous people. The prohibited class was deemed a danger by the legislature, and that conclusion is well supported by empirical evidence and statistics regarding domestic violence, recidivism by those convicted of misdemeanor crimes of domestic violence, and increased risks of serious harm and death posed when firearms are present in connection with domestic violence. *See United States v. Staten*, 666 F.3d 154, 161–67 (4th Cir. 2011) (outlining the legislative purpose and empirical evidence supporting the § 922(g)(9) prohibition). Individuals who pose a threat to the safety of their families, and potentially others,[9] would not have been welcome as part of a "well-regulated" militia and permitting them to possess firearms runs starkly counter to public safety goals of the Second Amendment. Inherent in the concept of self-defense is an interest in protecting the safety of innocent, law abiding citizens from criminals who would do them harm.

Without domestic violence statutes, there was no mechanism to readily identify and disarm domestic abusers in the founding era. Groups perceived as dangerous were identified by far more problematic criteria, including race, ethnicity, and religious identity for broad-based disarmament, and more localized authority existed to disarm or confine the mentally ill. Carlton F.W. Larson,

---

9 "[A] proven nexus exists between intimate partner violence and mass shootings….Domestic violence is a significant predictor of mass violence, as evidenced by both available data and an anecdotal review of recent attacks." Natalie Nanasi, *Disarming Domestic Abusers*, 14 Harv. L. & Pol'y Rev. 559, 565 (2020)

*Four Exceptions in Search of A Theory*: District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009) (citing authority for justices of the peace to confine the mentally ill). Section 922(g)(9) contains significant procedural safeguards to narrow the class prohibited from possessing firearms to those convicted, after receiving due process of law, of domestic violence offenses with an element requiring the use or attempted use of physical force or threatened use of a deadly weapon. 18 U.S.C. § 921(a)(33)(A)(ii).

The prohibition of possession of firearms by domestic violence misdemeanants, and other groups identified as dangerous, is supported by history. *See, e.g.*, Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U.L. Rev. 1187, 1239 (2015) ("[H]istory suggests that when the legislature restricts the possession of firearms by discrete classes of individuals reasonably regarded as posing an elevated risk for firearms violence, prophylactic regulations of this character should be sustained."); Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009) (citing historical examples for the proposition that "any person viewed as potentially dangerous could be disarmed by the government without running afoul of the 'right to bear arms.'"); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995) (application of the Second Amendment limited to "virtuous" citizens).

The Defendant urges the Court to disregard the Supreme Court's repeated invocation of "law-abiding" citizens in its recent Second Amendment jurisprudence, but the distinction between regulations that impact everyone and those that impact discrete groups found to pose a danger to the public is key to a historical understanding of the Second Amendment. Laws prohibiting most

people from carrying firearms in public or barring possession of firearms within a major city reach the core purposes of the Second Amendment, preventing individuals from using firearms to defend themselves (and from engaging in collective defense, should that become relevant to modern life). A law prohibiting a domestic violence misdemeanant from possessing a firearm restricts only those found, following due process, to pose a special danger of misusing firearms based on their own actions. Rather than promoting public safety, empirical evidence establishes that their possession of firearms poses a threat.

Recent decisions applying *Bruen* have reached similar conclusions. Addressing § 922(g)(9), a court in the Western District of Oklahoma reasoned that "[d]omestic violence misdemeanants can be viewed" as sufficiently similar to felons to permit prohibition for the same reasons and relied on *Heller* for the proposition that disarming felons is not inconsistent with the Second Amendment. *United States, v. Barry B. Jackson, Jr.*, No. CR-22-59-D, 2022 WL 3582504, at *3 (W.D. Okla. Aug. 19, 2022). The court also recognized that "the Supreme Court has repeatedly addressed the reach of § 922(g)(9) without questioning its constitutionality," including post-*Heller*. *Id*.

A district court in Mississippi applied *Bruen* to § 922(g)(3)'s prohibition on firearm possession by users of controlled substances. *United States v. Daniels*, No. 1:22-CR-58-LG-RHWR-1, 2022 WL 2654232, at *2 (S.D. Miss. July 8, 2022). The court questioned whether "section 922(g)(3) is textually covered by the Second Amendment, insofar as it has been interpreted to guarantee the right to keep and bear arms to ordinary, law-abiding, responsible citizens concerned with self-defense." *Id*. Ultimately, the court concluded that previous Seventh Circuit precedent established a sufficient historical basis for the regulation, noting "cases from the

nineteenth century upholding statutes which disarmed tramps and intoxicated persons" that had been found to justify disarming "dangerous or unvirtuous citizens." *Id.* at *4 (internal citations and quotation marks omitted). A South Carolina district court followed the same trend, denying a motion to dismiss a felon in possession charge. The court relied on the dicta in *Heller,* reiterated in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010), and restated in Justice Kavanaugh's concurrence in *Bruen* that those opinions did not cast doubt on the prohibition of possession of firearms by felons and certain other regulations. *United States v. Gabriel L'Ambiance Ingram*, No. CR 0:18-557-MGL-3, 2022 WL 3691350, at *3 (D.S.C. Aug. 25, 2022). The court reasoned that those discussions, "coupled with the majority's focus in *Bruen* on the Second Amendment rights of 'law-abiding citizens' throughout the opinion convinces this Court that the Supreme Court would conclude that these statutes fail to infringe on any Second Amendment rights." *Id*. This Court has not identified any district court that has granted a similar motion to dismiss any criminal charge under Section 922(g), to date.

In her dissent in *Kanter*, Justice Barrett wrote: "History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) (Barrett, J., dissenting). Common sense tells us that the public understanding of the Second Amendment at the time of its enactment,[10] which allowed for disarmament of Blacks and Native Americans based on their perceived threat, would have accepted disarmament of people convicted of misdemeanor crimes of domestic violence, a

---

10 In 1791, the drafters of the Constitution considered the undersigned's ancestors as legal property. They, along with free Blacks, were prohibited from possessing firearms. The popular conception of the Second Amendment at the time it was enacted clearly did not encompass *all* people having access to firearms to defend themselves and fight for freedom from tyranny.

group found by the legislative branch to present a danger of misusing firearms. The issue presented is whether the Second Amendment permits a regulation prohibiting people convicted of domestic violence offenses from possessing firearms. Nothing in the historical record suggests a popular understanding of the Second Amendment at the time of the founding that extended to preserving gun rights for groups who pose a particular risk of using firearms against innocent people. Accordingly, the Court finds that the Defendant's motion to dismiss should be denied.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that the *Defendant's Bruen-Based Motion to Dismiss* (Document 62) be **DENIED**. The Court further **ORDERS** that the *Motion of the United States for Leave to File Supplemental Authority* (Document 68) be **GRANTED** and the *Defendant's Further Reply to United States' Supplemental Response* (Document 69) be **STRICKEN**. Lastly, to the extent the Defendant's *Motion to Withdraw Guilty Plea, and for the Court to Further Consider Defendant's Bruen-Based Motion to Dismiss* (Document 61) seeks withdrawal of his guilty plea, the Court **ORDERS** that the same be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER: August 29, 2022

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA

16